Michael E. Tierney, Respondent, *v.* The Syracuse, Binghamton and New York Railroad Company, Appellant.

*Employees — not necessarily fellow-servants — liability of a master for his servant's acts — ordinarily a question for the jury.*

The fact that an employee of a railroad company, while working on a train running over the lines of another railroad company, is subject to the orders of the latter company, does not make him a fellow-servant of the employees of such latter company so as to preclude him from recovering damages from such latter railroad company for the negligent acts of its employees whereby he sustains injuries.

The test of a master's responsibility for the act of his servant is not whether it was done in accordance with the instructions of the master to the servant, but whether it was done in the prosecution of the master's business, and where an action is brought against a master to recover damages for injuries sustained by reason of the wrongful act of the servant, the inquiry is simply whether the wrongful act was in the performance of the master's work or outside of it.

The master may be liable although the servant was reckless and foolhardy, and he may be liable for acts of injury or insult if they occur in the course of the employment, and ordinarily the question is one for the jury to decide. .

Appeal by the defendant, The Syracuse, Binghamton and New York Railroad Company, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of Onondaga on the 16th day of October, 1893, upon the verdict of a jury for $10,000, rendered after a trial at the Onondaga Circuit, and also from an order entered in said clerk's office on the 16th day of October, 1893, denying the defendant's motion for a new trial made upon the minutes.

*Louis Marshall*, for the appellant.

*William Kennedy* and *J. & T. E. Courtney*, for the respondent.

MERWIN, J. :

This action is brought by the plaintiff to recover damages for personal injuries sustained by him on the 3d day of November, 1890, at a collision between a passenger train of the defendant and a freight train of the Delaware, Lackawanna and Western Railroad Company, at a small station on defendant's road called Rock Cut, which is about three miles southerly of the city of Syracuse. At that time the defendant owned, controlled and operated a line of railroad extending from the city of Syracuse to the city of Binghamton. The Delaware and Lackawanna Company owned or controlled a line of railroad running southerly from Binghamton, and also a line extending northerly from Syracuse to Oswego. There then existed a contract between the two companies, which was made the 8th of January, 1858, by which the defendant agreed " to allow the use of its road track to the party of the second part (the Delaware and Lackawanna Company) for the purpose of transporting coal thereon, which road track shall be kept in good running order by the party of the first part (the defendant)." The Delaware and Lackawanna Company agreed to pay the defendant a certain sum per mile for every ton of coal transported by it (the Delaware and Lackawanna Company) over the defendant's road, and agreed that it would transport at least a certain amount each year over the road, and would make the defendant's road its principal avenue for the transportation of coal destined for the lakes, Canada and points in Northern and Western New York. For returning empty coal cars over defendant's road no charge was to be made by defendant, and the Delaware and Lackawanna Company was allowed to carry on the returning cars certain kinds of freight and pay a certain sum per ton per mile. It was also agreed " that the time tables of the various trains over the Syracuse, Binghamton and New York railroad shall be arranged by the superintendent thereof and so regulated as to afford the party of the second part all needed facilities for running such number of coal trains daily as the business under the contract shall require ; passenger trains in all cases to take precedence ; coal and freight trains going north to take precedence

of those going south ; conductors of coal trains shall be under the control and subject to the orders of the superintendent of the Syracuse, Binghamton and New York railroad; the rate of speed of coal trains shall be restricted to ten (10) miles per hour ; all turn-outs, side tracks and switches on the line of the road necessary for the convenient transit of the trains shall be furnished by the party of the first part, and the party of the second part hereby agrees to transport over the road coal in equal monthly quantities, as nearly as the season of the year and the natural course of the trade will permit." There were other provisions in the contract that need not be referred to here.

The plaintiff, on the 3d day of November, 1890, was in the employ of the Delaware and Lackawanna Company as a brakeman, and had been for a number of years. He was one of the crew of a coal freight train of that company that was made up at Great Bend in the State of Pennsylvania. It left that place on the morning of that day and proceeded on a railroad of the Delaware and Lacka-wanna Company to Binghamton, where it took the road of the defendant and proceeded thereon, under the contract referred to, to Syracuse. There the coal was left, the engine turned round and started back with a train of empty cars and the same crew. They left Syracuse about five o'clock in the afternoon, reaching Rock Cut about half-past five, and there, by the direction of the train dispatcher of the defendant at Syracuse, they took a side track and waited for the passage of the north-bound passenger train of the defendant. This came along a few minutes before six o'clock, and by reason of the negligent manipulation of the southerly switch at that point by one Clark, an employee of the defendant at that station, it was partially thrown upon the side track on which the plaintiff's train was, and the engine on which he was then engaged was struck and the plaintiff injured.

On the part of the defendant it is claimed, (1) that the plaintiff and Clark were fellow-servants, and the defendant, therefore, is not liable, and (2) that Clark, in manipulating at that time the switch, was acting beyond the scope of his employment, and, therefore, the defendant is not liable. The trial court held as matter of law that plaintiff was not a fellow-servant of Clark or a co-employee, and submitted to the jury the question whether Clark was then acting

within the scope of his employment. The jury, in effect, found that he was.

1. The first proposition is based on the idea that at the time of the accident both men were under the exclusive control of the defendant. In the contract it was provided that the conductors of coal trains should be under the control and subject to the orders of the superintendent of defendant. The coal trains were to be and were on the time tables of defendant. Still, under the contract, the business of each was entirely separate. The defendant did not run the coal trains or transport the coal. The men on those trains were not in defendant's employ or in its business. It appears that the same person was general manager of both roads, and one person was superintendent of both on a division extending from Oswego to Binghamton. Still this did not consolidate the corporations, or make the business of each the same. The superintendent testified that he sometimes discharged delinquent employees on coal trains, and put others in their places, but that this was only done when the men had violated the rules of the road, and the occasion had arisen while the train was on his division. This, as the witness said, was " for the protection of the public and the protection of our own property, and the protection of everybody on the road." The general manager told him, " Make the men on the Delaware and Lackawanna obey the rules or discharge them."

In *Sullivan* v. *Tioga R. R. Co.* (44 Hun, 304) the plaintiff's intestate was an employee of the Erie railroad, and at work in its yard at Elmira. He was injured by reason of the negligence of the employees of the Tioga Railroad Company, in charge of a locomotive of that company in the yard. It was held by this court that the plaintiff's intestate and the defendant's employees on the locomotive were not co-servants, although the Erie road owned and controlled the yard, and when the defendant's locomotives were in it the servants employed on them were under the exclusive control of the officers of the Erie road, who directed how locomotives should be run, at what speed, what precautions should be used, and what signals given. The case was affirmed in the Court of Appeals (112 N. Y. 643), and it was said that the defendant and its employees used the yard of the Erie road under such regulations as were imposed as conditions of use, not of service, and so the intestate

was in respect to his employment a stranger to the defendant. The case of *Smith* v. *N. Y. & H. R. R. Co.* (19 N. Y. 127) is inferentially in the same direction. The case of *Zeigler* v. *Danbury & Norwalk R. R. Co.* (52 Conn. 543) is very much in point. There the Danbury and Norwalk and the Shepaug railroads formed a continuous line. By an arrangement between the two companies a train owned and run by the Shepaug Company went over both roads to a certain point and back daily, the Danbury and Norwalk Company paying the Shepaug Company monthly an agreed price for the service upon its road. The train when on the road of the Danbury and Norwalk Company was under its general control, and governed by its rules, and it had entire control of the hands upon it, including the right to discharge any of them for neglect, or any improper conduct while on the road, but the Shepaug Company was at liberty to use what engine and employ what hands it pleased. The plaintiff was a brakeman on this train, and was injured by a collision with a train of the Danbury and Norwalk Company on its own road, caused by the negligence of the conductor of that train. It was held that the plaintiff was not an employee of the Danbury and Norwalk Company, and that the conductor of the other train was, therefore, not his fellow-servant.

Numerous cases are cited by the learned counsel for the appellant, but they do not, we think, reach the present question. The power of defendant's superintendent in certain cases to discharge men on the coal trains is specially dwelt upon, but that is to be construed with reference to the object to be attained under the contract. The coal trains were not the defendant's trains, nor were the men in its employ.

We think that upon this subject the trial court did not err.

2. The accident at Rock Cut was occasioned by the act of Clark in moving the switch so that the passenger train was thrown on the side track. Clark was a young man about seventeen years old, and had been at that place about a week. He was the only employee of the defendant stationed at that place. It was a telegraph station and Clark was the operator. The main line of the defendant has but one track, and at Rock Cut there is a side track on each side. The switch there that was operated on the occasion in question was what is called the "Wharton safety switch." There is a heavy ball

on the lever which must be raised and held up in order to allow a train to pass on to the side track. When the ball was down on the ground the main track was unbroken. The switch could be locked down by means of a padlock. Clark seems to have received his instructions as to his duties from his predecessor at that place. He was told that it was his duty to flag the highway crossing and keep a train sheet, and telegraph to the main office the passage of trains; that in the morning a south-bound passenger train and a north-bound coal train met at that place and it was his duty to then operate the switch so that the coal train could enter on the side track and allow the passenger train to go by, and he understood that when other trains met at that place he did not have to turn the switch, but the men on the trains would do it themselves. A key to the switch was given him and he understood it was his duty to lock it nights, and that it might remain unlocked during the day. The hours of Clark at the station were from about seven in the morning to six in the afternoon. Ten or eleven regular trains passed each day during his working hours. There was a pair of scales there that he operated. The place was a flag station where passengers got on and off. There was a small building or shanty there where the mail had been formerly received, but was not then, and one of the rooms was used as a telegraph office.

Upon the evening in question the switch was unlocked. The ball was down, and had Clark not touched it the train would have passed safely. Clark, when he saw the train from the south approaching, was in the office. He came out, picked up his lantern and signaled the train that the crossing was all right, and then, as he testifies : " I swung my lantern and then I had an idea that the switch was wrong. These two trains leave here in the morning, the one from the north and the one from the south, and the train from the north comes down the main track. It is my business when I go down in the morning to let this train from the south in on the side track, and it was in such a flash that I got mixed up on the morning and evening. I thought I ought to let the express in on the side track. I let it in. I went up to the switch and raised the lever. The engine and about two cars and a half got in on the side track and I realized my mistake and dropped the lever. I tried to right the mistake. I threw the rear end of the Pullman on to the main track. The rest .

of the train was on the main track, and the part that was smashed was on the side one." He also says : "I had an idea that the train ought to go in on the siding, the same as the morning. * * * I ran as fast as I could from the crossing to the switch. I had a cattle guard and culvert to pass. I started with the impression that I had got to turn the switch and didn't change that impression until I dropped the ball. I gave no other signal for the train to stop."

The test of a master's responsibility for the act of his servant is, not whether it was done in accordance with the instructions of the master to the servant, but whether the act was done in the prosecution of the master's business. (*Cosgrove* v. *Ogden*, 49 N. Y. 255.) In *Mott* v. *Consumers' Ice Co.* (73 N. Y. 543) the following propositions are laid down : " For the acts of a servant, within the general scope of his employment, while engaged in his master's business, and done with a view to the furtherance of that business and the master's interests, the latter is responsible, whether the act be done negligently, wantonly or even willfully ; the quality of the act does not excuse. But if the servant, without regard to his service, or to accomplish some purpose of his own, acts maliciously or wantonly, the master is not liable. Where, therefore, an action is brought against the master for the wrongful act of the servant, the inquiry is simply whether the wrongful act was in the course of the employment or outside of it." The master may be liable though the servant is reckless and foolhardy. (*Ochsenbein* v. *Shapley*, 85 N. Y. 222.) So he may be, for acts of injury and insult, if they occur in the course of the employment. (*Palmeri* v. *The Manhattan Railway Co.*, 133 N. Y. 261.) Ordinarily the question is one for the jury to decide. (*Mott* v. *Consumers' Ice Co., supra,* 550, and cases cited.)

Under the circumstances of the present case we are of the opinion that the question whether Clark was at the time of the accident acting within the scope or course of his employment was properly left to the jury. Clark was placed by the defendant in control of the switch as he was given a key to it. For some purposes he was authorized to manipulate it, and if he exceeded his instructions to the injury of a third party the defendant, who furnished him the means and opportunity to cause the injury, should bear the loss rather than an innocent party. Clark, according to his own evi-

dence, thought he was furthering the interest of his employers. He supposed he was in the line of his duty. The court charged, at the request of defendant, that if Clark was acting maliciously or under the influence of temporary mental aberration the plaintiff could not recover. ·

The defendant claims that the decision of this court in *Burke* v. *This Defendant* (69 Hun, 21) is in the way of plaintiff's recovery. That case related to the same disaster and was an action brought by the administratrix of the engineer of the passenger train. The engineer was in the employ of defendant and so was a co-employee with Clark. The questions considered were whether, in several different aspects, there was negligence on the part of the corporation itself. The question whether the defendant was liable for the negligence of Clark was not considered, and the ruling there does not, therefore, affect this case.

It is further claimed by the defendant that the verdict is excessive. By the collision the plaintiff was rendered unconscious, and so remained for several days. He was taken to a hospital, and there remained till the twentieth of December following and then was taken to his home at Great Bend. He received severe cuts and bruises on his right leg and his back was bruised. It was, as he testifies, five or six months before his wounds healed over. He has been in pain ever since; could not walk for a year without crutches, and after that walked with a cane. He commenced to work some in February, 1892, and prior to the trial in October, 1893, had worked about eight months. He was not able to work full time; didn't average fifteen days a month. He says: " When I was injured I got $1.90 a day as wages, and had been for about nine years. I am not very able to work now because I am injured. I am crippled and my constitution can't stand the work. To stand on my leg affects it, so I can't stand on it, and stand steady on it. I can't bend it. My back pains me steady all the while, has since I got hurt. I have never been free from pain there since I got hurt; it seems as though it is a kind of boring right through there; steady pain on me all the while; it beats in the small of my back. * * * Since I got hurt I never had any appetite and don't care if I never have anything to eat; always had a good appetite before. I have to get up

in the night, and can't sleep, several times because of pain.  \*  \*  \*
I am affected with pains so I can't sleep; have to get out of bed
and walk the floor for to get rest; have to several times. Aside
from pain I can't sleep with pain. As to the feeling of my limbs
and sensation of my back it feels as though there was pain there all
the while; feels numb. Heat and cold does not make much change
on my back, because I always keep it pretty warm. My leg is cold.
No matter how warm the weather is the leg is always cold; that is
so ever since I got hurt.  \*  \*  \*  The changes in the atmosphere
affect me in a way that when the change of the weather is I have
more pain than I have at other times; consequently can't sleep or
can't rest or can't work in fact when the weather is changeable.
\*  \*  \*  The injuries that were of a serious character were the
injuries to my leg and back. When I first became conscious I don't
remember the condition of the leg, because they had it all tied up.
I did not see it at that time. When I saw the leg it was all raw
like a piece of beefsteak. It was all cut to pieces and torn to pieces;
burned up. I don't think it was smooth all the way down; there
were cuts or holes in it located from below the knee up to the small
of the back, up on the right side of the body all the way up; run-
ning from below the knee up to the calf of the leg. The injuries
upon my back were not on the right side. They were in the middle
of the back. It was a bruise in the small of the back.  \*  \*  \*
Before I received these injuries physically I was strong and healthy;
never was sick to my knowledge. I could work all right, right
along all the time doing a day's work. I had no trouble with my
limbs; no bruises of any other kind before this accident."

There was medical evidence to the effect that the right leg was
smaller than the left one, and was much cooler; that it was weaker
than the other, and would become more so, and the power of the
muscle to contract would largely disappear; that he could not fully
use the limb on account of pain, and it would remain so; that he
could not straighten the leg without pain, and this difficulty was
likely to remain; that there was a tenderness at the place of the
injury in the back that was likely to be permanent or worse; that
when the spine is affected it is a serious matter, and a complete
restoration of the function of the member is impossible. There was
other evidence which, if relied on, would indicate that the injuries

were less grave, but the subject was for the jury to pass upon.   In one view of the case the jury might have said that not only were the injuries and the pain and suffering therefrom very serious, but that also the effect was likely to be permanent, so that the plaintiff's ability for labor would be very materially affected if not substantially destroyed.   We are of the opinion that sufficient grounds for us to interfere do not appear.

The foregoing considerations lead to an affirmance of the judgment.

HARDIN, P. J., and MARTIN, J., concurred.

Judgment and order affirmed, with costs.